## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DOTLYN JOGRAJ,**<br>　　　　**Plaintiff,**<br><br>v.<br><br>**ENTERPRISE SERVICES, LLC** *et al.*,<br>　　　　**Defendants.** | ) ) ) ) ) ) ) ) ) | **Case No. 1:16-cv-1846-RMC** |
| **ROSALIND PARKER,**<br>　　　　**Plaintiff,**<br><br>v.<br><br>**ENTERPRISE SERVICES, LLC** *et al.*,<br>　　　　**Defendants.** | ) ) ) ) ) ) ) ) ) | **Case No. 1:16-cv-1847-RMC** |
| **LORI LEE STULTZ** *et al.*,<br>　　　　**Plaintiffs,**<br><br>v.<br><br>**ENTERPRISE SERVICES, LLC** *et al.*,<br>　　　　**Defendants.** | ) ) ) ) ) ) ) ) ) | **Case No. 1:16-cv-1848-RMC** |
| **DOUGLAS LEVITAS** *et al.*,<br>　　　　**Plaintiffs,**<br><br>v.<br><br>**ENTERPRISE SERVICES, LLC** *et al.*,<br>　　　　**Defendants.** | ) ) ) ) ) ) ) ) ) | **Case No. 1:16-cv-1849-RMC** |

| | |
|---|---|
| JEROME BOYD, | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:16-cv-2037-RMC |
| | ) |
| THE EXPERTS, INC. *et al.*, | ) |
|     Defendants. | ) |
| | ) |
| SHERRIE T. LAWSON, | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:16-cv-2038-RMC |
| | ) |
| THE EXPERTS, INC. *et al.*, | ) |
|     Defendants. | ) |
| | ) |

## OPINION

On September 16, 2013, Aaron Alexis, a civilian contractor working as a computer technician at Washington, D.C.'s Navy Yard, used a valid temporary access card to enter Building 197 of the facility and then opened fire on its occupants, killing and wounding several people. In the wake of that tragedy, several related lawsuits have been filed against Defendants The Experts, Inc., the subcontractor that employed Mr. Alexis; Enterprise Services, LLC,[1] the contractor that retained The Experts; and the Hana Group, Inc. and HBC Management Services, Inc. (collectively HBC), which provided security services to Building 197.[2] The Court

---

[1] Until recently, Enterprise Services, LLC was known as HP Enterprise Services, LLC. References to that former name or "HPES" in this or related litigations should be understood to refer to Enterprise Services, LLC.

[2] The cases are: *Delorenzo v. Enterprise Servs., LLC*, 15-cv-216; *Frasier v. Enterprise Servs., LLC*, 15-cv-1492; *Proctor v. Enterprise Servs., LLC*, 15-cv-1494; *Halmon-Daniels v. The Experts, Inc.*, 15-cv-1501; *Kohler v. Enterprise Servs., LLC*, 15-cv-1636; *Ridgell v. Enterprise Servs., LLC*, 15-cv-2637; *Zagami v. Enterprise Servs., LLC*, 15-cv-1638; *McCullough v. Enterprise Servs., LLC*, 15-cv-1639; *Jacobs v. The Experts, Inc.*, 15-cv-2242.

has previously ruled on motions to dismiss in several of these cases in an Opinion issued September 15, 2016 (the Prior Opinion, or Prior Op.).  *See, e.g.,* Mem. and Op., Dkt. 132, *Delorenzo v. Enterprise Servs., LLC*, 15-cv-216.

The six above-captioned cases are follow-on litigation[3] not before the Court at the time it issued its initial rulings.  Four of these cases (*Jograj*; *Parker*; *Stultz*; and *Levitas*) were filed in this Court directly.  The remaining two (*Boyd* and *Lawson*) were originally filed in filed in Superior Court for the District of Columbia and then removed here.  Defendants have moved to dismiss these new complaints.[4]  Plaintiffs have opposed those motions,[5] and Defendants have

---

[3] *See* Jograj Compl. [Dkt. 1]; Parker Compl. [Dkt. 1]; Stultz Compl. [Dkt. 1; Levitas Compl. [Dkt. 1]; Boyd Am. Compl. [Dkt. 12]; Lawson Am. Compl. [Dkt. 12].

[4] *See* Enterprise Servs.' Mot. to Dismiss, *Jograj v. Enterprise Servs., LLC* [Dkt. 13]; The Experts' Mot. to Dismiss, *Jograj v. Enterprise Servss., LLC* [Dkt. 14]; HBC's Mot. to Dismiss, *Jograj v. Enterprise Servs., LLC* [Dkt. 20]; Enterprise Servs.' Mot. to Dismiss, *Parker v. Enterprise Servs., LLC* [Dkt. 13]; The Experts' Mot. to Dismiss, *Parker v. Enterprise Servs., LLC* [Dkt. 14]; HBC's Mot. to Dismiss, *Parker v. Enterprise Servs., LLC* [Dkt. 20]; Enterprise Servs.' Mot. to Dismiss, *Stultz v. Enterprise Servs., LLC* [Dkt. 13]; The Experts' Mot. to Dismiss, *Stultz v. Enterprise Servs., LLC* [Dkt. 14]; HBC's Mot. to Dismiss, *Stultz v. Enterprise Servs., LLC* [Dkt. 20]; Enterprise Servs.' Mot. to Dismiss, *Levitas v. Enterprise Servs., LLC* [Dkt. 14]; The Experts' Mot. to Dismiss, *Levitas v. Enterprise Servs., LLC* [Dkt. 15]; HBC's Mot. to Dismiss, *Levitas v. Enterprise Servs., LLC* [Dkt. 21]; Enterprise Servs.' Mot. to Dismiss, *Boyd v. The Experts, Inc.* [Dkt. 13]; The Experts' Mot. to Dismiss, *Boyd v. The Experts, Inc.* [Dkt. 14]; Enterprise Servs.' Mot. to Dismiss, *Lawson v. The Experts, Inc.* [Dkt. 11]; The Experts' Mot. to Dismiss, *Lawson v. The Experts, Inc.* [Dkt. 12].

[5] *See* Pl.'s Opp'n to Enterprise Servs.' Mot. to Dismiss (Jograj Enterprise Opp'n), *Jograj v. Enterprise Servs., LLC* [Dkt. 16]; Pl.'s Opp'n to The Experts' Mot. to Dismiss (Jograj Experts Opp'n), *Jograj v. Enterprise Servs., LLC* [Dkt. 17]; Pl.'s Opp'n to HBC's Mot. to Dismiss (Jograj HBC Opp'n), *Jograj v. Enterprise Servs., LLC* [Dkt. 26]; Pl.'s Opp'n to Enterprise Servs.' Mot. to Dismiss (Parker Enterprise Opp'n), *Parker v. Enterprise Servs., LLC* [Dkt. 16]; Pl.'s Opp'n to The Experts' Mot. to Dismiss, (Parker Experts Opp'n) *Parker v. Enterprise Servs., LLC* [Dkt. 17]; Pl.'s Opp'n to HBC's Mot. to Dismiss (Parker HBC Opp'n), *Parker v. Enterprise Servs., LLC* [Dkt. 26]; Pls.' Opp'n to Enterprise Servs.' Mot. to Dismiss (Stultz Enterprise Opp'n), *Stultz v. Enterprise Servs., LLC* [Dkt. 16]; Pls.' Opp'n to The Experts' Mot. to Dismiss (Stultz Experts Opp'n), *Stultz v. Enterprise Servs., LLC* [Dkt. 17]; Pls.' Opp'n to HBC's Mot. to Dismiss (Stultz HBC Opp'n), *Stultz v. Enterprise Servs., LLC* [Dkt. 26]; Pls.' Opp'n to Enterprise Servs.' Mot. to Dismiss (Levitas Enterprise Opp'n), *Levitas v. Enterprise Servs., LLC*

replied.[6]  The motions are now ripe for the Court's review.  The Court will dismiss all counts against all Defendants save those alleging negligent retention and supervision of Mr. Alexis by both The Experts and Enterprise Services.  No claims survive against HBC, which will be dismissed as a Defendant.

## I. BACKGROUND

Six Plaintiffs are workers at the Navy Yard who witnessed the shootings and allege both physical and psychological injuries as a result of Mr. Alexis's rampage.  They are as follows:

(1) Dotlyn Jograj, *Jograj v. Enterprise Servs., LLC*, 16-cv-1846;
(2) Rosalind Parker, *Parker v. Enterprise Servs., LLC*, 16-cv-1847;
(3) Lori Lee Stultz, *Stultz v. Enterprise Servs., LLC*, 16-cv-1848;
(4) Douglas Levitas, *Levitas v. Enterprise Servs., LLC*, 16-cv-1849;
(5) Jerome Boyd, *Boyd v. The Experts, Inc.*, 16-cv-2037
(6) Sherrie Lawson, *Lawson v. The Experts, Inc.*, 16-cv-2038.

Two Plaintiffs allege loss of consortium through their partners' injuries:

(1) Gary Stultz, *Stultz v. Enterprise Servs., LLC*, 16-cv-1848;
(2) Jennifer Levitas, *Levitas v. Enterprise Servs., LLC*, 16-1849.

---

[Dkt. 17]; Pls.' Opp'n to The Experts' Mot. to Dismiss (Levitas Experts Opp'n), *Levitas v. Enterprise Servs., LLC* [Dkt. 18]; Pls.' Opp'n to HBC's Mot. to Dismiss (Levitas HBC Opp'n), *Levitas v. Enterprise Servs., LLC* [Dkt. 27]; Pl.'s Opp'n to Enterprise Servs.' and The Experts' Mots. to Dismiss (Boyd Opp'n), *Boyd v. The Experts, Inc.* [Dkt. 17]; Pl.'s Opp'n to Enterprise Servs.' and The Experts' Mots. to Dismiss (Lawson Opp'n), *Lawson v. The Experts, Inc.* [Dkt. 15].

[6] *See* Enterprise Servs.' Reply, *Jograj v. Enterprise Servs., LLC* [Dkt. 23]; The Experts' Reply, *Jograj v. Enterprise Servs., LLC* [Dkt. 24]; HBC's Reply, *Jograj v. Enterprise Servs., LLC* [Dkt. 27]; Enterprise Servs.' Reply, *Parker v. Enterprise Servs., LLC* [Dkt. 23]; The Experts' Reply, *Parker v. Enterprise Servs., LLC* [Dkt. 24]; HBC's Reply, *Parker v. Enterprise Servs., LLC* [Dkt. 27]; Enterprise Servs.' Reply, *Stultz v. Enterprise Servs., LLC* [Dkt. 23]; The Experts' Reply, *Stultz v. Enterprise Servs., LLC* [Dkt. 24]; HBC's Reply, *Stultz v. Enterprise Servs., LLC* [Dkt. 27]; Enterprise Servs.' Reply, *Levitas v. Enterprise Servs., LLC* [Dkt. 23]; The Experts' Reply, *Levitas v. Enterprise Servs., LLC* [Dkt. 25]; HBC's Reply, *Levitas v. Enterprise Servs., LLC* [Dkt. 28]; Enterprise Servs.' Reply, *Boyd v. The Experts, Inc.* [Dkt. 18]; The Experts' Reply, *Boyd v. The Experts, Inc.* [Dkt. 19]; Enterprise Servs.' Reply, *Boyd v. The Experts, Inc.* [Dkt. 16]; The Experts' Reply, *Boyd v. The Experts, Inc.* [Dkt. 17].

Plaintiffs collectively assert numerous claims against the Defendants.  All Plaintiffs bring common law negligence claims against Enterprise Services, The Experts, and HBC for failing to anticipate and prevent the shooting; similarly, all Plaintiffs allege that Enterprise Services and The Experts were negligent in their hiring, retention, and supervision of Mr. Alexis.  All Plaintiffs further allege that Enterprise Services and The Experts were negligent *per se* for their failure to abide by certain federal statutes, regulations, and policy manuals.

## II. JURISDICTION

It is incumbent on the Court on its own initiative to verify its jurisdiction. In five of the cases—*Jograj*; *Parker*; *Stultz*; *Levitas*; and *Lawson*—Plaintiffs all reside in states different from all Defendants,[7] and the amount in controversy for all five is greater than $75,000. Accordingly, the Court has diversity jurisdiction over these cases pursuant to 28 U.S.C. § 1332(a)(1) (2012).  However, Plaintiff Jerome Boyd and Defendant The Experts are both residents of Florida, precluding diversity jurisdiction in Mr. Boyd's case.  The question remains, then, whether jurisdiction over Mr. Boyd's Complaint lies under 28 U.S.C. § 1331, which provides jurisdiction for federal questions.

---

[7] Defendants are residents of the following states:  (1) Enterprise Services, Delaware/Texas, *see* Jograj Compl. ¶ 2; (2) The Experts, Florida, *see id*. ¶ 3; (3) HBC, Pennsylvania, *see id*. ¶¶ 4, 5. Plaintiffs reside in the following states:  (1) Dotlyn Jograj, Maryland, *see* Jograj Compl. ¶ 1; (2) Rosalind Parker, Maryland, *see* Parker Compl. ¶ 1; (3) Lori Lee and Gary Stultz, Virginia, *see* Stultz Compl. ¶ 1; (4) Douglas and Jennifer Levitas, Virginia, *see* Levitas Compl. ¶ 1; (5) Sherrie Lawson, North Carolina.

Ms. Lawson is listed a "male adult resident of St. Petersburg, in Pinellas County, Florida," Lawson Am. Compl. ¶ 2, but this appears to be a scrivener's error, as this is the same information listed for Plaintiff Jerome Boyd, represented by the same law firm. Based on the captioned address listed in her Complaint, Ms. Lawson appears to be a resident of Charlotte, North Carolina.  *Id*. at 1.  However, even if she were a resident of Florida, the Court would have jurisdiction for the same reason it has jurisdiction over Mr. Boyd's case.

"[T]he vast majority of cases brought under the general federal-question jurisdiction of the federal courts are those in which federal law creates the cause of action." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986). Mr. Boyd brings only claims under state law, which would typically preclude consideration of such claims in this Court. However, there are certain exceptions to this general rule.

Congress has constitutional power to "exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased . . . for the Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings." U.S. Const. art. I, s. 8, cl. 17. While the issue is not entirely settled, courts have generally read the "Enclave Clause" to establish federal subject matter jurisdiction over tort claims occurring on federal enclaves, and have allowed such claims to proceed even when applying state law. *See Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir.1998) (finding that "personal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as part of federal question jurisdiction"); *Federico v. Lincoln Military Hous.*, 901 F. Supp. 2d 654, 656 (E.D. Va. 2012) (finding federal subject matter jurisdiction where Plaintiff brought tort claim against government contractor operating on federal enclave).

The Navy Yard is the Navy's oldest shore establishment, originating in 1799. Building 197, where the shooting occurred, houses the Navy Sea Systems Command, responsible for engineering, building, and supporting the Navy's fleet of ships. The Navy Yard therefore qualifies as a federal enclave. Further, this incident, which has already generated a thorough investigation by the Navy, and which involves several issues of Navy contracting and operating procedures, implicates federal interests. Because the tort claims in Mr. Boyd's Complaint arise

from activities in a federal enclave, and because the Court must directly interpret federal law in order to resolve these claims, federal question jurisdiction is appropriate under § 1331.

### III. FACTS

The Complaints contain lengthy factual allegations regarding the sequence of events. Plaintiffs rely heavily on government investigations after the incident, and adopt several government determinations as part of their own allegations. The Court has already described the factual circumstances underlying these cases in detail in its Prior Opinion, and while it has considered all facts presented, provides a shorter summary here.[8]

In the years leading up to his employment with The Experts and Enterprise Services,[9] Mr. Alexis had a history of violent outbursts and arrests—although no convictions— including some that occurred while Mr. Alexis served in the Navy. Despite these incidents, Mr. Alexis was honorably discharged in December 2010, retaining his security clearance.

In September 2012, Mr. Alexis applied to work as a computer technician with The Experts, which operated as a subcontractor for Enterprise Services on the latter's contract to supply certain information technology (IT) services to the Navy. The contract between Enterprise Services and the Navy referenced the National Industrial Security Program Operating

---

[8] The facts described here draw from the six Complaints. The Court has also considered documents incorporated by reference in the Complaints. *See EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997) (stating that courts may consider documents incorporated by reference in a complaint, as well as any matters of which the Court may take judicial notice, without converting a motion to dismiss into a motion for summary judgment); *see also Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119-20 (D.D.C. 2011) (explaining that courts may consider such documents even if they are not produced "by the plaintiff in the complaint but by the defendant in a motion to dismiss") (citations and internal quotation marks omitted). Much of the background information was learned by Navy investigators after September 16, 2013.

[9] For purposes of the motions to dismiss, the Court and Enterprise Services assume that Mr. Alexis was an employee or contractor of both Enterprise and The Experts.

Manual (NISPOM), which defined security requirements for security-cleared contractors and required contracting parties to report negative personnel incidents to the personnel security clearance management system in the Department of Defense, known as the Joint Personnel Adjudication System.

Under NISPOM, Mr. Alexis's security clearance was still valid in September 2012, because he had been discharged from the Navy within the prior 24 months. Enterprise Services also required The Experts to run a background check on new employees, which consisted of a drug test, a driving record check, and a criminal conviction check. Mr. Alexis cleared all these background checks and was hired by The Experts.

Mr. Alexis worked for The Experts until December 2012, when he voluntarily resigned. He reapplied in June 2013, and, after once again passing background drug, driving, and convictions checks, was rehired in July 2013.

## A. Events of August 2013

In August 2013 Mr. Alexis was assigned to a project at the Naval Undersea Warfare Center in Newport, Rhode Island. On August 4, while awaiting a flight to Rhode Island, Mr. Alexis called his project coordinator to complain volubly that a man was making fun of him in the airport. The coordinator calmed Mr. Alexis and on August 5 reported the call to the company's contract team. Mr. Alexis also called the company's travel coordinator later, complaining of the noise level in his hotel and asking to move to another hotel, which he did.

Two days later, on August 6, Mr. Alexis again called the travel coordinator and complained that three individuals had followed him from the first hotel to his new hotel, and were using an "ultrasonic device that was physically pinning him to the bed." *See* Prior Op. at 7. Mr. Alexis made a similar report to his program manager. That evening the travel coordinator

spoke to the desk clerk at Mr. Alexis's hotel and expressed concern that Mr. Alexis could harm someone. The travel coordinator also contacted the contract program manager to report the situation.

The hotel desk clerk contacted the Naval Station Newport police to report the information from the travel coordinator and request that an officer be present near the hotel in case Mr. Alexis tried to hurt someone. The police who responded to the call found that Mr. Alexis had dismantled his bed and taped a microphone to the ceiling to record the voices of the individuals who had allegedly followed him. The police saw no reason to arrest Mr. Alexis or place him in protective custody.

That evening, the contract's program manager, her immediate supervisor, and The Experts' Facility Security Officer spoke by conference call. They decided that Mr. Alexis should leave Newport and return to Fort Worth to rest. A little after 11:30 p.m., the Security Officer canceled Mr. Alexis's visit notification to the Undersea Warfare Center by an entry in the Joint Personnel Adjudication System. At 1:12 a.m. on August 7, 2013, the program manager emailed Enterprise Services representatives and the rest of The Experts' contract management team and informed them that Mr. Alexis was not feeling well and would be returning to Fort Worth.

At 3:00 a.m. that night, Mr. Alexis called the Enterprise Services second shift supervisor in Newport and told her that he was being followed. He asked to stay in her room at her hotel, to which she agreed. When he arrived, he told her that he was hearing voices. The shift supervisor dismissed Mr. Alexis's story and went to sleep. Mr. Alexis called the City of Newport Police, who responded to his call at 6:20 a.m. and took a statement. Later that morning, the City of Newport Police Officer-in-Charge contacted the Naval Station Police Sergeant and

faxed him a copy of the police report, with a note saying "FYI on this. Just thought to pass it on to you in the event this person escalates."

Between 10:00 and 10:30 a.m., the Enterprise Services' second shift supervisor contacted her lead supervisor and learned that Mr. Alexis was being withdrawn from the Newport assignment. When the Enterprise Services' second shift supervisor returned to her room, Mr. Alexis reported that the three individuals who had been following him were now in the room above and that he wanted to find a radar gun in order to hear what they were saying. The shift supervisor also reported this interaction to her supervisor.

The Experts' HR Director and Legal Counsel instigated an investigation into Mr. Alexis's behavior. After interviewing several people with knowledge of Mr. Alexis and the incident, The Experts management concluded that there was insufficient evidence to file any adverse information report with the government, and that Mr. Alexis could return to work after some rest. The Experts assigned Mr. Alexis to four projects between August 12 and September 6, 2013, during which time there are no allegations of unusual behavior.

**B. Events of September 2013**

On September 9, 2013, The Experts assigned Mr. Alexis to the Washington Navy Yard. On September 14, Mr. Alexis purchased a shotgun and sawed off the barrel. He carved the words "my ELF [extremely-low frequency] weapon," "better of [sic] this way," "not what y'all say," and "end to the torment" onto the gun.

On September 16, Mr. Alexis used his valid access pass to drive a rental car into the Navy Yard, and, carrying the shotgun in a backpack, used his valid temporary building pass to enter the Navy Yard's Building 197 without passing through any metal detectors. Although HBC was providing security services for Building 197 at the time, Mr. Alexis was not stopped or

searched by any HBC employee.  Traveling to the fourth floor, Mr. Alexis proceeded to fire indiscriminately, traveling throughout the building, until the police shot and killed him after approximately an hour.

## IV. LEGAL STANDARDS

### A. Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)

Security contractor HBC moves to dismiss all claims against it for lack of subject matter jurisdiction.  *See* HBC MtD at 2.  Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both a statutory requirement and an Article III requirement.  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction") (internal citations omitted).  Dismissal on the basis that Plaintiffs' claims present non-justiciable political questions constitutes a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) and "not an adjudication on the merits."  *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1262 (D.C. Cir. 2006).

When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court should "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived

from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)

(quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). Nevertheless, "the court need

not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts

alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Speelman v.

United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006). A court may consider materials outside the

pleadings to determine its jurisdiction. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107

(D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir.

2003). A court has "broad discretion to consider relevant and competent evidence" to resolve

factual issues raised by a Rule 12(b)(1) motion. *Finca Santa Elena, Inc. v. U.S. Army Corps of

Engineers*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing 5B Charles Wright & Arthur Miller,

Fed. Prac. & Pro., Civil § 1350 (3d ed. 2004)); *see also Macharia v. United States*, 238 F. Supp.

2d 13, 20 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (2003) (in reviewing a factual challenge to the

truthfulness of the allegations in a complaint, a court may examine testimony and affidavits). In

these circumstances, consideration of documents outside the pleadings does not convert the

motion to dismiss into one for summary judgment. *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13,

21 (D.D.C. 2003).

### B. Failure to State a Claim Under Federal Rule of Civil Procedure 12(b)(6)

Enterprise Services and The Experts rest their motions to dismiss on Federal Rule

of Civil Procedure 12(b)(6), alleging a failure of Plaintiffs to state a claim. *See* Enterprise

Servs.' Mem. at 1; Experts Mem. at 3. A motion to dismiss for failure to state a claim challenges

the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). A complaint must be

sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it

rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a complaint does not

need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* A court must treat the complaint's factual allegations as true, "even if doubtful in fact," *id.*, but a court need not accept as true legal conclusions set forth in a complaint, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. A complaint must allege sufficient facts that would allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79. In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

## V. ANALYSIS

Defendants assert that Plaintiffs' claims fail as a matter of law. Because the claims against HBC are fundamentally different than the claims against Enterprise Services and The Experts, the Court will address claims against HBC separately. It begins with claims asserted against Enterprise Services and The Experts.

Plaintiffs' claims sound in varying forms of District of Columbia tort law. The D.C. Court of Appeals has considered "the requisite duty of care required for negligence" to be "a function of foreseeability, arising only when foreseeability is alleged commensurate with 'the extraordinary nature of [intervening] criminal conduct.'" *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 641 (D.C. 2005) (quoting *Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C. 1997)); *see also Workman v. United Methodist Comm. on Relief*, 320 F.3d 259, 265

(D.C. Cir. 2003) (noting that "D.C. Courts have repeatedly spoken of the heightened foreseeability requirement in terms of duty") (citations omitted). In such circumstances, "the plaintiff bears the burden of establishing that the criminal act was so foreseeable that a duty arises to guard against it." *Potts*, 697 A.2d at 1252. The Court "appl[ies] the law of the District of Columbia as its own courts would apply it" and does not "second-guess the analytical framework those courts have erected." *Workman* 320 F.3d at 263. To make a tort claim Plaintiffs must allege sufficient facts showing that: (1) Enterprise Services and The Experts owed a duty of care to Plaintiffs to conform to a certain standard of care; (2) Enterprise Services and The Experts breached this duty of care; and (3) the breach of said duty proximately caused Plaintiffs' injuries. *See District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001).

In the District of Columbia, there is a "general rule of nonliability at common law for harm resulting from the criminal acts of third parties." *Romero v. Nat'l Rifle Ass'n of Am., Inc.*, 749 F.2d 77, 81 (D.C. Cir. 1984) (citing *Kline v. 1500 Massachusetts Ave. Apartment Corp.*, 439 F.2d 477, 481 (D.C. Cir. 1970); *Hall v. Ford Enterprises Ltd.*, 445 A.2d 610, 611 (D.C. 1982)).

One limited exception to this "rule of nonliability" is the "heightened foreseeability" test, through which a defendant may be liable for harm resulting from another's criminal act only if it were particularly foreseeable to the defendant that the third party would commit that crime. *Workman*, 320 F.3d 263. This heightened showing of foreseeability has been described as "'exacting,' 'demanding,' 'precise,' and 'restrictive.'" *Sigmund v. Starwood Urban Inv.*, 475 F. Supp. 2d 36, 42 (D.D.C. 2007) (*Sigmund I*), *aff'd sub nom. Sigmund v. Starwood Urban Retail VI, LLC*, 617 F.3d 512 (D.C. Cir. 2010) (*Sigmund II*) (citing *Novak v. Capital Mgm't. & Dev. Corp.*, 452 F.3d 902, 912 (D.C. Cir. 2006); *Bell v. Colonial Parking,*

*Inc.*, 807 F. Supp. 796, 797 (D.D.C. 1992); *Potts*, 697 A.2d at 1252; *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C. 1980)).

The "heightened foreseeability" test usually requires *particular* foreseeability; the defendant must have been able to foresee the precise crime committed, not just a likelihood of criminal activity. *Sigmund I*, 475 F. Supp. 2d at 42 (noting that a heightened showing of foreseeability "requires proof that the specific type of crime, not just crime in general, be particularly foreseeable at the relevant location") (citing *Romero*, 749 F.2d at 79-80; *Lacy,* 424 A.2d at 323); *McKethean*, 588 A.2d at 717 (explaining that "that a specific crime, 'rather than merely harm in general,' [must be] foreseeable").

However, when applying this standard, D.C. courts take into account the particular theory of negligence as well as the facts of the case. "The question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures to guard against it . . . [, which] is ultimately a question of fairness." *Romero*, 749 F.2d at 79 (internal quotation marks and citations omitted).

As discussed more fully in the Court's Prior Opinion, D.C. law requires less exacting foreseeability in two situations: those involving (1) "a special relationship between the parties to the suit" or (2) "a relationship of control between the defendant and the intervening criminal actor." Prior Op. at 23 (quoting *Romero*, 749 F.2d at 81). These are "[t]he only District cases departing from that [general] rule" of nonliability. *Id.*; *see also Workman*, 320 F.3d at 263 ("From our review of the D.C. cases, we see that the requirement that the defendant would have been able to foresee that a third party would likely commit a criminal act ordinarily has, and perhaps must have, a relational component.").

Plaintiffs have not alleged any special relationship between themselves and the Defendants. The only question, then, is whether a "special relationship of control" existed between these two Defendants and Mr. Alexis.

In its Prior Opinion, the Court undertook an extended analysis of the nuances of D.C. law as it relates to an employer's duty of care to third parties in contact with individuals under that employer's supervision. *See* Prior Op. at 25-35. Incorporating that reasoning by reference, the Court will not repeat its discussion here. While Defendants renew their arguments, they ultimately present no basis for the Court to modify that analysis.

The Court harmonizes these strands of D.C. law without difficulty. An intervening criminal act is, by definition, unforeseeable to the typical employer; the employer is not negligent in failing to prevent it. In contrast, the employer's own actions are totally within its control, and if it acts negligently and thereby allows an employee to injure another person, the employer may be liable to the injured party. Examples of relevant acts by an employer in which its own negligence may result in liability for an employee's criminal acts lie in the employers own hiring, supervision, and retention practices and decisions. *See* Prior Op. at 22-28. *See also Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) (applicable standard is whether "an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner").

Plaintiffs allege that they were injured because The Experts and Enterprise Services hired, supervised and retained Mr. Alexis negligently. Because all evidence they cite of Mr. Alexis's pre-hire actions would not have become known in a criminal convictions check, the Court dismissed claims of negligent hiring in its Prior Opinion and will do so again here. *See* Prior Op. at 36-40. However the facts are in dispute concerning the retention and supervision of

Mr. Alexis by The Experts and Enterprise Services.  Discovery will illuminate these relationships and the nature of the oversight provided.

### A. Claims Previously Addressed By this Court

#### 1. Negligent Hiring, Retention, and Supervision of Mr. Alexis by Enterprise Services and The Experts

All six Plaintiffs claim that Enterprise and The Experts acted negligently in their hiring, retention, and supervision of Mr. Alexis.[10]  This is the most prominent surviving claim of the original complaints, and remains so here; the Court, for the reasons stated below and consistent with its Prior Opinion, will dismiss the claims based on negligent hiring of Mr. Alexis but will not dismiss the claims for negligent retention and supervision of him.

As in its Prior Opinion, the Court concludes that Plaintiffs do not state a claim for negligent hiring of Mr. Alexis.  "An employer cannot be liable for negligent hiring if the employer conducts a reasonable investigation into the person's background or if such an investigation would not have revealed any reason not to hire that person." *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 230 (D.D.C. 2015) (quoting *Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 28-29 (D.D.C. 2008)).  Therefore, "to state a claim for negligent hiring, a plaintiff must allege specific facts from which an inference can be drawn that the employer did not conduct a reasonable background investigation, and that such an investigation would have uncovered a reason not to hire the alleged tortfeasor." *Id.*

---

[10] *See* Jograj Compl. Counts IV and VI; Parker Compl. Counts IV and VI; Stultz Compl. Counts IV and VI; Levitas Compl. Counts IV and VI; Boyd Am. Compl. Counts V and VI; Lawson Am. Compl. Counts V and VI.

Plaintiffs argue that Enterprise Services and The Experts negligently hired Mr. Alexis because they failed to uncover his previous violent outbursts and incidents with police. *See, e.g.,* Jograj Compl. ¶ 105; Parker Compl. ¶ 105; Stultz Compl. ¶ 105; Levitas Compl. ¶ 105.

However, Mr. Alexis was subject to criminal convictions checks, a driving record check, and a drug test, all of which he passed. Plaintiffs do not identify what further checks Defendants were obliged to perform, nor what statutory or policy guidance they were violating in not conducting any further checks. While they assert that the Defendants should have been aware of the arrests and violent incidents in Mr. Alexis's past, these assertions lack factual support. As articulated in the Prior Opinion, *see* 36-40, the Court is aware of no regulation requiring the Defendants to seek out non-conviction arrest records in pre-employment background checks. In hiring Mr. Alexis, Enterprise Services and the Experts affirmatively undertook steps to learn that Mr. Alexis (1) had no criminal convictions; (2) was honorably discharged from the Navy; and (3) had an active security clearance. In light of these facts, Plaintiffs cannot state a cognizable claim that The Experts and Enterprise Services failed to exercise reasonable care when hiring Mr. Alexis.

## 2. Negligent Retention and Supervision of Mr. Alexis

As stated above, the question the Court must answer is whether Plaintiffs have stated a claim that Enterprise Services and The Experts "knew or should have known" that Mr. Alexis "behaved in a dangerous or otherwise incompetent manner" prior to the Navy Yard shooting, and that Enterprise Services and The Experts, "armed with that actual or constructive knowledge failed to adequately supervise" Mr. Alexis. *Giles*, 487 A.2d at 613 (citing *Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61, 64 (D.C. 1983). The Court concludes, as it did in its earlier opinion, that the Plaintiffs have stated a claim.

The crux of Plaintiffs' theory is that, because Enterprise Services and The Experts employed Mr. Alexis, (1) they had the ability to control his actions, and, aware of his prior behavior, should have exercised that control; and (2) it was only through his employment with Enterprise and The Experts that Mr. Alexis had access to his victims. The operative question is what Enterprise and The Experts knew or should have known about Mr. Alexis prior to the shooting.

The sufficiency of Plaintiffs' allegations must rest on the events of August 2013, and whether they were enough to put The Experts and Enterprise Services on notice that Mr. Alexis could have turned to criminal behavior at his workplace. Manifestation of a mental illness alone would usually be insufficient to establish a duty on the Defendants' part. *See Hicks v. United States*, 511 F.2d 407, 415 (D.C. Cir. 1975) ("Generalizations must be avoided as much as possible in the area of psychiatry" and, thus, a "claim of negligence must be considered in light of the elusive qualities of mental disorders and the difficulty of analyzing and evaluating them."). In this instance, the circumstances of the August 2013 incidents suffice—barely—to meet the liberal pleading standard for a motion to dismiss.

All the alleged facts are relevant and must be considered to determine the Defendants' contemporaneous knowledge—actual or constructive. Some key allegations include the repeated involvement of the police, including several instances in which the police were contacted, and the fact that one police officer informed another of the situation "in the event [Mr. Alexis] escalates." Defendants' possible knowledge of this communication is unclear. Also relevant is the fact that The Experts' travel coordinator contacted the Navy Gateway Inns & Suites to express concern that Mr. Alexis may harm someone. Furthermore, management personnel for both Enterprise Services and The Experts were aware of at least some aspects of

the August 2013 incidents.  Without a fully-developed factual record, it is not possible to

determine the degree to which Enterprise Services and The Experts had actual or constructive

knowledge of Mr. Alexis's volatility that might have imposed a duty on them to take further

action.  Accordingly, Plaintiffs' claims that Enterprise Services and The Experts failed to

adequately retain and supervise Mr. Alexis will proceed to discovery.

### 3. Negligent Hiring, Retention, and Supervision of The Experts by Enterprise Services

Four of the immediate Complaints also allege negligent hiring, retention, and

supervision of subcontractor The Experts by primary contractor Enterprise Services.[11]  In its

Prior Opinion, the Court ruled that Enterprise Services failed to move for dismissal of this claim,

and therefore denied Enterprise's motion to dismiss it.  *See* Prior Op. at 47.

In its new omnibus motion to dismiss, Enterprise Services now affirmatively

moves to dismiss this additional claim.  *See* Enterprise Mem. at 10.  Enterprise Services argues

that no factual allegation in the Complaints suggests that The Experts acted in a "dangerous or

otherwise incompetent manner" that might suggest The Experts might cause harm or create an

unreasonable risk of bodily harm to others.

The Court agrees.  Leaving merits of Plaintiffs' negligent retention and

supervision claim against The Experts vis-à-vis Mr. Alexis for further development, Plaintiffs

allege no negligence on the part of The Experts that could rise to the levels of "dangerous or

otherwise incompetent" such that Enterprise Services could be liable for failure to hire, retain or

supervise The Experts.  Accordingly, these counts will be dismissed from the pending

Complaints.

---

[11] *See* Jograj Comp. Count IV; Parker Compl. Count IV; Stultz Compl. Count IV; Levitas Compl. Count IV.

### 4. Common Law Negligence Claims

Plaintiffs additionally assert a number of variously-described common law negligence claims, such as "negligence" and "negligent undertaking."[12]  Plaintiffs concede in opposition that these claims are identical to those dismissed by the Prior Opinion.  *See, e.g.,* Jograj Enterprise Opp'n at 6; Boyd Opp'n at 7.

As the Court explained in its Prior Opinion, *see* Prior Op. at 48-51, these claims are, at best, duplicative reiterations of the negligent retention and supervision claims.  "Claims are duplicative when they 'stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available.'"  *DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 18-19 (D.D.C. 2014) (citing *Wultz v. Islamic Republic of Iran,* 755 F. Supp. 2d 1, 81 (D.D.C. 2010)).  As such, these claims will be dismissed as a matter of judicial economy.  *See id*.

### 5. Negligent Failure to Warn

Four of the immediate Complaints include an allegation that Defendants were negligent for "failing to warn invitees" of the danger posed by Mr. Alexis.[13]   The Court addressed negligent failure to warn in its Prior Opinion and incorporates that reasoning here.  *See* Prior Op. at 51-52.  To the extent that this allegation operates as a claim of negligence separate

---

[12] These counts are as follows:  Jograj Compl. Counts II, III, V, VI; Parker Compl. Counts II, III, V, VI; Stultz Compl. Counts II, III, V, VI; Levitas Compl. Counts II, III, V, VI; Boyd Am. Compl. Counts I, II; Lawson Am. Compl. Counts I, II.

[13] *See* Jograj Compl. Counts III and VI; Parker Compl. Counts III and VI; Stultz Compl. Counts III and VI; Levitas Compl. Counts III and VI.

from the claim of negligence supervision, it runs afoul of the higher standard of foreseeability that D.C. law applies to negligence claims.

### 6. Negligence *Per Se* and Statutory Claims

In addition to common-law negligence claims, the six new complaints also advance theories that Defendants violated certain statutory obligations and are therefore negligent *per se*.[14] Plaintiffs allege that Enterprise Services and The Experts violated the D.C. Industrial Safety Act (ISA), D.C. Code §§ 32-801 (2001), *see, e.g.*, Levitas Enterprise Opp'n at 6, as well as NISPOM, *see* Boyd Opp'n at 7. As the Plaintiffs acknowledge, these claims are fundamentally identical to those brought in the first set of complaints on which the Court has ruled. The Court engaged in an extended discussion of the merits of these statute-based negligence *per se* claims and, while incorporating its reasoning, will not repeat its in-depth analysis here. *See* Prior Op. 53-61.

No statute identified by the Plaintiffs, or under which the Plaintiffs could be understood to be asserting a claim, provides a relevant duty that could support such a claim. As the Court found in its Prior Opinion, neither the ISA nor NISPOM, nor any other asserted statute, imposes a duty on employers to protect against workplace violence. While the ISA allows negligence claims for work-related accidents, no case relied upon by Plaintiffs involves intentional torts or intervening criminal conduct. Similarly, Plaintiffs do not identify any obligation under NISPOM, or any other Department of Defense policy materials, that would create any such duty triggering negligence *per se*. The Court will therefore dismiss these counts; namely Jograj Complaint Count VII; Parker Complaint Count VII; Stultz Complaint Count VII;

---

[14] *See* Jograj Compl. Count VII; Parker Compl. Count VII; Stultz Compl. Count VII; Levitas Compl. Count VII; Boyd Am. Compl. Counts III and IV; Lawson Am. Compl. Counts III and IV.

Levitas Complaint Count VII; Boyd Amended Complaint Counts III and IV; and Lawson Amended Complaint Counts III and IV.

### 7. Vicarious Liability/Agency

Mr. Boyd and Ms. Lawson separately allege that Enterprise Services and The Experts are "vicariously liable for their agent Alexis' actions" through what they title an "Agency" theory of liability. Boyd Am. Compl. ¶¶ 24, 97, Counts VII and VIII; Lawson Am. Compl. ¶¶ 24, 96, Counts VII and VIII. The Court dismissed similar counts in its Prior Opinion, *see* Prior Op. at 65-71, and will do so again here.

These Complaints do not articulate the underlying claim for which they assert Defendants' vicarious liability, although their briefs tie vicarious liability to claims of intentional infliction of emotional distress. *See* Boyd Opp'n at 12, Lawson Opp'n at 12.[15] However, in order to bring a vicarious liability claim, Plaintiffs must show that Mr. Alexis was acting within the scope of his responsibilities as a computer technician during his attack in Building 197 on September 13, 2013. But no criminal act by Mr. Alexis on September 13, 2013 could be reasonably said to have been within his job responsibilities or to further the interests of any Defendant. *See Penn Cent. Transp. Co. v. Reddick,* 398 A.2d 27, 31 (D.C. 1979) ("The employer will not be held liable for those willful acts, intended by the agent only to further his own interest, not done for the employer at all."); *see also Butera & Andrews v. IBM Corp.*, 456 F. Supp. 2d 104, 112 (D.D.C. 2006).

---

[15] To the extent Plaintiffs intend to claim vicarious liability for assault and battery, such claims are time barred under D.C. law, which provides a one-year statute of limitation on assault and battery claims. D.C. Code § 12-301(4). Any assault-and-battery claims began to accrue on September 13, 2013. These complaints were originally filed on September 13, 2016, well after the one-year limit. Because Plaintiffs could not sue Mr. Alexis for assault and battery, they cannot bring such a vicarious liability claim against his employers.

**B. Claims Not Previously Addressed in the Court's Prior Opinion**

The Court now turns to new claims brought by Plaintiffs that were not previously considered by the Court in its Prior Opinion.

**1. Negligent Infliction of Emotional Distress**

Negligent infliction of emotional distress is brought by at least four Plaintiffs: Jograj Compl. Count IX; Parker Compl. Count IX; Stultz Compl. Count IX; and Levitas Compl. Count IX. The remaining two Plaintiffs allege "mental harms," Boyd Am. Compl. ¶¶ 77-80, Lawson Am. Compl. ¶¶ 77-80, which the Court will construe as also alleging negligent infliction of emotional distress. *See Sowell v. Hyatt Corp.*, 623 A.2d 1221, 1224 (D.C. 1993) (stating negligent infliction of emotional distress requires "a general statement about the requirements for recovery for emotional harm and resultant physical injury caused by a defendant's negligence").

Negligent infliction of emotional distress is understood in D.C. law in terms of duty. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 795 (D.C. 2011) ("[T]he different treatment accorded claims of mental distress is not based on a straightforward application of the traditional principles of negligence . . . . Rather, by framing the question in terms of "duty," instead of proximately caused damages, courts have purposely developed the common law to balance competing societal interests."). D.C. courts do not recognize a general duty of care to avoid emotional injuries in the way that exists for physical injuries, and will only allow recovery for such emotional injuries under certain circumstances. The tort of negligent infliction of emotional distress in D.C. requires a plaintiff to show that he or she was (1) in the "zone of danger;" which was (2) created by the defendant's negligence; (3) making the plaintiff fear for his or her own safety; resulting in (4) emotional distress that was serious and verifiable. *See Rice*

*v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011); *see also Williams v. Baker*, 572 A.2d 419, 424 (D.C. 1991).

Where a preexisting duty is breached, D.C. courts allow recovery for emotional injuries that arise from that breach. *See Hedgepeth*, 22 A.2d at 794-95 ("If the applicable standard of care is breached, the person to whom the duty is owed may recover for damages proximately caused by the negligence, including damages for physical injury, monetary loss, and ancillary or 'parasitic' damages for related mental distress (sometimes referred to as 'pain and suffering').")。 The question facing the Court in assessing Plaintiffs' claims for negligent infliction of emotional distress is not whether they have alleged injuries, but whether they have alleged a relevant duty.

Plaintiffs have failed to do so. As with their other negligence claims, Plaintiffs must show that they meet the heightened foreseeability standard that applies when an intervening criminal act is present. Failing to do so, they have not properly stated a claim for negligent infliction of emotional distress.

### 2. Loss of Consortium

Plaintiffs Stultz and Levitas claim loss of consortium. *See* Stultz Compl. Count X; Levitas Compl. Count X. Consortium claims are predicated on "an injury to the marriage itself," *Felder v. WMATA*, 174 F. Supp. 3d 524, 531 (D.D.C. 2016). "[E]ach state has a significant governmental interest in regulating the legal rights of its married couples." *Id*. D.C. law directs its courts to apply the law of the state where the marriage is domiciled when

considering loss of consortium claims. *See id.*; *see also Stutsman v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 546 A.2d 367, 373 (D.C. 1988).

In the matter at hand, Plaintiffs concede that the marriages of both Mr. Stultz and Ms. Levitas are domiciled in the Commonwealth of Virginia. *See* Levitas Opp'n at 3 ("Plaintiffs Levitas and Stultz acknowledge that Virginia does not recognize loss of consortium as an independent claim and therefore concede those claims.") The Court applies Virginia law when assessing their loss of consortium claims. However, Virginia has abolished loss of consortium. *See* Va. Code. Ann. § 55-36 (West). The Court will dismiss these loss of consortium claims.

### 3. Failure to Allege Harms

Finally, Enterprise Services asserts that the Boyd and Lawson Complaints must be dismissed in their entirety for failure to allege adequately any damages caused by Defendants' alleged negligence. *See* Enterprise Servs.' Mem. at 12-15. Enterprise Services argues that neither Complaint has pled more than conclusory and formulaic damage. *See id.* at 12.

The Court disagrees that these Plaintiffs have failed to allege sufficient harm. Mr. Boyd alleges that he "was a witness to the shooting causing him metal [sic] and physical harms." Boyd Am. Compl. ¶¶ 77-81. Ms. Lawson alleges that she "was with a group of co-workers who escaped through an emergency exit that let them out into a small alley where they scaled a wall to safety. Ms. Lawson was witness to the shooting causing her metal [sic] and physical harms." Lawson Am. Compl. ¶¶ 77-80. Both Mr. Boyd and Ms. Lawson make clear that the basis for their harms are witnessing the shooting and taking action to escape from it. These alleged harms, whatever their ultimate validity, may be cognizable harms under D.C. law, depending on the particular factual circumstances of the case. *See Rice*, 774 F. Supp. 2d at 25. Further, they are sufficient to put Enterprise Services on notice to allow it to conduct adequate discovery into the

nature and substance of the alleged harms. Therefore, the Court will not dismiss the Boyd and Lawson Complaints for insufficient pleading of harm.

### C. HBC's Motion to Dismiss

Plaintiffs Jograj, Parker, Stultz and Levitas bring negligence claims against HBC as well as Enterprise Services and The Experts. These claims are essentially identical to claims previously addressed in the Court's Prior Opinion, with one new legal claim for negligent infliction of emotional distress, as well as two new factual allegations, specifically that HBC failed to monitor closed circuit television and failed to intervene. *See* Jograj Compl. at Count VIII and ¶ 116. HBC moves to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), asserting that the claims involve a political question, as well as under Rule 12(b)(6) for failure to state a claim. Both arguments were dealt with at length in the Court's Prior Opinion, and the Court incorporates that reasoning by reference here, denying HBC's motion to dismiss under 12(b)(1) and granting it under 12(b)(6).

### 1. Motion to Dismiss under Rule 12(b)(1)

HBC argues, for the first time, that the Plaintiffs' claims should be dismissed because they raise a non-justiciable political question, and because HBC is entitled to government contractor immunity. As to the first, HBC adopts a very similar defense originally argued by The Experts (which no longer relies on the defense). While the argument has switched Defendants, it remains fundamentally the same. The Court engaged in a considerable discussion of the merits of the issue in its Prior Opinion, *see* Prior Op. at 17-19, and will adopt its reasoning here.

The political question doctrine, as articulated in *Baker v. Carr*, 369 U.S. 186 (1962), enumerates six factors that would render a case non-justiciable because of a political question:

> Prominent on the surface of any case held to involve a political question is found (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment of multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id*. As it found previously, the Court finds that these factors are not implicated here. *see* Prior Op. at 17-19. While the Complaint does implicate Navy policies and contracts, the gravamen of Plaintiffs' claims against HBC are based on HBC's contractual duties, not the Navy's decisionmaking process or authority, or even the reasons underlying the Navy's inclusion of certain obligations in the HBC contract. As a result, the Court need not evaluate the validity of Navy policies or procedures. Thus, it cannot be said that resolving Plaintiffs' action would require the Court to infringe on a textually demonstrable constitutional commitment of an issue to a coordinate political department, make a policy determination of a kind clearly for nonjudicial discretion, express a lack of respect for coordinate branches of the government, adhere to a political decision already made, or create embarrassment through multifarious pronouncements of various departments on the same question. Similarly, because the underlying tort law surrounding duties that arise by contract is relatively clear, judicially discoverable and manageable standards for resolving Plaintiffs' claims exist. Because

no *Baker* factors are implicated, the Court need not dismiss Plaintiffs' complaints because of a political question.

Similarly, the Court need not dismiss Plaintiffs' claims under 12(b)(1) because HBC is entitled to governmental immunity as a government contractor. Federal law preempts state law tort claims made against government contractors in the same way that the military itself is immune from suit where such contractors are (1) integrated into military operational activities; (2) performing a combat mission with the military; or (3) under ultimate military command. *See Saleh v. Titan Corp.*, 580 F.3d 1, 9 (D.C. Cir. 2009). So, for example, in *Saleh*, the employees of a contractor that worked in an American-run Iraqi prison were immune from suit from tort claims arising from their alleged abuse of Iraqi prisoners because those employees were found to be integrated into military operational activities. *Id.* at 7.

Here, however, while HBC had a contract with the Navy, and could arguably be understood to be under ultimate military command, HBC makes no showing that it was integrated into military activities or performing a common mission with the military. HBC analogizes Mr. Alexis' September 13 shooting to a terrorist attack, and by extension argues that, by providing security services, HBC was in common mission with the Navy. HBC Mot. at 17. However, providing stateside building security services, while an important and vital activity, does not involve a commonality of mission with U.S. armed forces. *See Salah*, 580 F.3d at 9. The same form of security can be found in buildings across the country. The Court concludes that HBC is not entitled to government contractor immunity.

### 2. Motion to Dismiss under Rule 12(b)(6)

All of Plaintiffs' negligence tort claims against HBC are grounded in the theory that, by agreeing contractually to provide security services to Building 197, HBC assumed a duty

to the building's occupants. In so doing, Plaintiffs identify multiple clauses of HBC's contract with the Navy that obliged it to take steps for the protection and safety of the building's occupants. *See, e.g.,* Jograj HBC Opp'n at 22. While these clauses do refer to HBC's obligation to deter, report and monitor crimes and suspicious activities, no clause required HBC to prevent the commission of all crimes in the building, or to protect against all unforeseeable criminal acts.

Further, negligence tort claims against HBC suffer from the same impediment as those brought against the other Defendants; especially in instances of intervening criminal activity, negligence claims must meet the high foreseeability standard applied by D.C. *See Haynesworth*, 645 A.2d at 1098 (citing *Powell v. District of Columbia*, 602 A.2d 1123, 1133 (D.C. 1992)). Plaintiffs argue that heightened foreseeability does not apply in this circumstance because HBC's contract created a special relationship between them and Building 197's occupants. The Court disagrees. However, even if a lower standard of foreseeability applied, Plaintiffs would not be able to meet it based on the facts before the Court.

Mr. Alexis, with a valid security clearance and valid entry passes, was authorized to enter and work in Building 197. No Plaintiff alleges that HBC had been notified of Mr. Alexis's conduct in August 2013 incidents or was otherwise aware of any proclivity towards violence on Mr. Alexis's part. No facts, therefore, lead to the conclusion that Mr. Alexis's actions were in any way foreseeable to HBC. "A defendant may not be held liable for harm actually caused where the chain of events leading to the injury appears 'highly extraordinary in retrospect.'" *Morgan v. District of Columbia*, 468 A.2d 1306, 1318 (D.C. 1983) (quoting *Lacy v. District of Columbia*, 424 A.2d 317, 320-21 (D.C. 1980)). The two new factual allegations do not resolve the fundamental foreseeability issue. For these and the other reasons discussed in the Court's Prior Opinion, the Court will dismiss these claims against HBC.

**VI. CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part the

Motions to Dismiss filed by Enterprise Services and The Experts in each case. It will also grant

in part and deny in part HBC's Motion to Dismiss, dismissing all claims against it. Thus, all

claims against all Defendants will be dismissed, with the exception of Plaintiffs' claims against

Enterprise Services and The Experts for negligent retention and supervision of Mr. Alexis.

A memorializing Order accompanies this Opinion.


Date: September 1, 2017 _____/s/_____
ROSEMARY M. COLLYER
United States District Judge